# Kratzwald v. Commonwealth.

Nov. 3, 1944.

Henry Jackson and Kelly J. Francis for appellant.

Eldon S. Dummit, Attorney General, and Blanche Mackey, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the April, 1942, term of the Boyle circuit court the appellant, Rudolph Kratzwald, was indicted charged with murdering James Plummer, a deaf-mute. His trial thereunder was continued from term to term until the regular one in September, 1943, when he was convicted of voluntary manslaughter with an attached punishment of five years' confinement in the penitentiary. His motion for a new trial was overruled and judgment rendered, to reverse which he prosecutes this appeal relying solely on the ground that the evidence was insufficient to sustain a conviction, and for which reason his motion for a directed verdict of acquittal—made at the close of the Commonwealth's testimony and at the close of all of the testimony—should have been sustained. Although his motion for a new trial contained a number of other

grounds, none of them. is meritorious except possibly one hereinafter referred to, but which is unavailable to appellant for reasons hereinafter stated, and which leaves for our consideration only the alleged error of insufficient evidence.

The homicide, if it did occur, was committed in Shelby City in Boyle County in front of a retail store building operated by Henry Shearin, and at which he sold gasoline. The body of the deceased, to whom we shall hereafter refer to as ''dummy,'' (as is done in the record), when found by James Hargis, a traveler on the highway, was lying some three or four feet from the macadamized portion of the highway in front of Shearin's store building, but the fact was not revealed to the local public until some time after one o'clock A. M. of a night in February, 1942, but no witness in the case stated what night in that month the deceased lost his life, except that it was on a Saturday night of that month. There was a jagged gash in the top of his skull some three inches long which was proven by the physician at the hospital in Danville where the body was taken, to have crushed his skull which produced his death a short time after he entered the hospital.

The evidence pointing to appellant as the guilty one who inflicted the death blow to the deceased is purely circumstantial, and it is argued by his counsel in this court that it amounted to no more than the creation of a bare suspicion of their client's guilt, whilst the Commonwealth in its brief argues that the testimony extended beyond the limitation of producing only a bare suspicion of appellant's guilt and was sufficient to sustain the verdict as returned by the jury. Those respective contentions impose upon us the task of briefly reviewing the testimony so as to determine which of them is correct.

The chief witness for the Commonwealth was Mary Purdom, who operated a restaurant in Shelby City some two blocks from Shearin's place of business and which was known as ''Airport Inn,'' at which she sold beer, but there is no evidence that any other alcoholic beverages were sold by her. She testified that between 9:30 and 10 o'clock on the night in question appellant and one Bill Carter came to her place of business together and that both of them were drinking, and Carter was considerably intoxicated. He became noisy and trouble-

some and began leapfrogging about over the tables and premises and that she requested appellant to take him home, he admitting that he brought Carter to the restaurant in his (appellant's) automobile; that appellant then in obedience to her request left the premises with Carter, and that appellant alone later returned to her restaurant, having been gone about thirty minutes; that during the time of his absence the deceased appeared for the first time that night and that after appellant's return some of her other customers were playing the victrola and most, if not all of them, were drinking beer, among the latter being appellant and dummy. She also testified that between the time of appellant's return and the closing of the restaurant (which was near 12 o'clock) the subject of the war was mentioned during which the name "Hitler" was spoken, and that deceased then gave a demonstration as to what should be done to Hitler by taking his knife and drawing it across his stomach and emptying the contents therefrom, which was done by signs, and at that time he was conversing with the witness who was behind the counter preparing some sandwiches that had been ordered; that deceased, who could indistinctly speak some words, was trying to talk to her following his demonstration as to what should be done to Hitler, when appellant, who was standing nearby, inquired of her what the dummy had said which she waived and then deceased asked her what was said by appellant and she likewise waived answering his inquiry; that about that time she moved a short distance from the place where she was standing, but she observed a conversation or attempted conversation between appellant and the dummy, and that appellant seemed to be somewhat angry but that the matter passed and nothing else occurred between the two thereafter.

It should be said at this point that the parents of appellant were German born and came to this country years ago and obtained naturalization papers, but appellant himself was a native born American. Witness stated that about 11:45 on the occasion referred to she announced that she was going to close her restaurant and for the inmates to vacate it, upon which there was a call by some of the customers, if not all of them, for more beer, but she stated to them that they would have to take the bottles out of the restaurant and drink the beer on the outside, which according to her testimony they did. That statement by her is denied by no one.

She said that after the restaurant was emptied of customers she heard a bottle fall upon the entrance walk, which was built of concrete, and she went out to clear the walk of the broken glass and the spilt beer. There were at that time, as she stated, about four of her customers there, the others having taken their departure, two of them being the dummy and appellant who were engaged in a conversation or a discussion, and in which appellant said, "I never said anything to you;" that immediately appellant asked the witness where the dummy lived and offered to carry him home, to which witness answered that the dummy had frequently gone home by himself and that he could do so then, and at the same time told appellant to not carry the dummy away, and told dummy not to go home in appellant's automobile. Dummy shook his head and uttered distinctly enough to be understood the words "No good." Witness then went back into her restaurant and closed the door, but realizing that both appellant and dummy had not departed she raised a window and saw both appellant and dummy get into the former's car and drive away.

Witness had in her employ a young lady by the name of Dorothy Carey whose lodging room was on the second floor of witness' restaurant, but she had obtained permission from her employer at about six o'clock P. M. on the involved occasion to join a party of friends and be absent for the rest of the night. She was therefore not present at any of the times hereinbefore referred to. When Miss Carey did not return to the restaurant at 12 o'clock or shortly thereafter, and after everyone had left the premises, the witness drove in her automobile to a place where she suspected her servant was, and in making that trip she passed by Shearin's place of business but did not at that time discover decedent's body in front of Shearin's store, nor did she look in that direction when she passed it; but on her return trip she did discover decedent's body by the side of the road as hereinbefore described and that she turned on the side light of her automobile and saw appellant get into his automobile in front of Shearin's place near the mouth of a lane running by it and drive away; that shortly after arriving at her restaurant her young lady servant arrived and to whom she related what she had discovered. Whereupon the young lady went out of the building and returned with a jagged rock that had been partially buried by the side of a hydrant and that

it had on it some hair and blood which could have produced the injury found on the deceased before appellant took him away. The testimony of the witness as to when the dummy appeared at her restaurant that night, as hereinbefore related, and as to appellant's later appearing without his friend, Carter, was substantiated by some of the witnesses testifying for the Commonwealth.

Appellant was never arrested until after the return of the indictment, but in the meantime an inquisition was held by the County Attorney at which appellant appeared, and stated that he took Bill Carter home about 10 o'clock and that he never returned to the restaurant. Appellant did not deny making that statement, but said that he was evidently mistaken as to the time. That evidence is relevant for the purpose of contradicting appellant's alibi witnesses as to when he arrived at the home of Carter and at his own home. Those alibi witnesses were O. Carman, his young daughter and a couple or more of the members of appellant's family who stated that when appellant returned with his friend, Carter, he returned to his home and remained there the rest of the night.

Following the death of the deceased and during the period intervening before appellant was indicted, the witness, Purdom, stated that he approached her on several occasions and sought to induce her to say that he left her restaurant with his companion, Carter, at about 10 o'clock and did not return thereafter, which she declined to do, when appellant replied, "Nobody had better not connect me with the dummy." She testified also that in those conversations with appellant he would inquire whether she saw him "hit the dummy" to which she gave a negative answer, and at the same time said to appellant, "You know, Rudy, you was out there, and I tried to get you to leave him alone and not take him home." However, appellant denied that portion of her testimony. None of the alibi witnesses testified as to the day of the month nor the day of the week when the facts to which they testified occurred, and the testimony of at least some of them was more or less confused and contradictory.

We have not attempted to quote verbatim all of the guilty testimony of the witnesses for the Commonwealth, but we have attempted to give the substance if it. If

the testimony, the substance of which we have related, were believed by the jury—which was necessarily done in order to arrive at the verdict returned—then we have a case where appellant was the only one in company with the deceased shortly before the mortal wound was inflicted upon him. Also that he was seen by the witness, Purdom, at the place where the body was later found by the witness, Hargis, and that he departed therefrom in his automobile which was the same one in which both he and the deceased departed from the restaurant a short time before. Also that appellant apparently became angry because of the remark made by the deceased with reference to Hitler, and that he appeared to be quarreling with deceased after they left the restaurant and before their final departure therefrom. We have also seen that appellant tried to induce the chief witness for the Commonwealth to tell a different story from what she said were the facts, and he told the sheriff and the county attorney that he left the restaurant at 10 o'clock with his companion, Bill Carter, and never returned thereto, while in his testimony at the trial he said that he left the restaurant near 12 o'clock. If he had left there at 10 o'clock, as he told the sheriff and county attorney, it would contradict the testimony of his alibi witnesses since they testified that he returned with his companion, Carter, near 12 o'clock. Such testimony creates more than a mere suspicion of guilt. On the contrary it creates a strong conviction of defendant's guilt, although his only possible motive may have been slight.

In the case of Russell v. Commonwealth, 276 Ky. 38, 122 S. W. 2d 1009, we held in somewhat similar circumstances (quoting from the syllabus): "While proof of motive is usually an important element where evidence is circumstantial, it is not absolutely necessary that motive be proved to sustain a conviction for manslaughter." The effect to be given to circumstantial evidence alone in criminal prosecutions is set forth in many cases cited in Vol. 6 of West Ky. Digest under the heading "Criminal Law," secs 552 (2) and 552 (3), with additional later cases under the same key numbers in the Annual Supplement in the back of that volume. They are all in full accord with what we have stated to be the rule with reference to the sufficiency of circumstantial testimony to authorize a conviction, and it will be found that a conviction was upheld in every case where

the circumstances were such as is shown in this one, and in some cases the circumstances were not as convincing as those appearing in this record.

But it is argued that decedent's death may have been produced by an automobile on the highway colliding with him, although there is no evidence that he was a pedestrian on the highway, and such conclusion is altogether speculative and not as forceful to support a counter-conclusion that appellant struck decedent on the head with the rock, mentioned by the witness, Purdom, or that he struck him en-route to the place where his body was found and threw it out, or that they had an altercation at that place during which the wound was inflicted, from the scene of which appellant fled as testified to by the witness Purdom. Her testimony would have to be entirely eliminated from the case before a directed verdict of acquittal would be authorized. She testified intelligently, and her testimony was not weakened by intense cross-examination. Other proven circumstances substantiate the testimony given by her, and at least one witness corroborated her upon the fact that appellant made two visits to the restaurant of Mrs. Purdom, at the end of the first of which he carried away his companion, Carter, and later appeared without him.

We referred in a former part of this opinion to a relied on error which possibly contained merit, but was unavailable to appellant on this hearing. It was not specifically set out or referred to in the motion for a new trial, but is sought to be embraced within the ground of the admission of improper evidence. The witness, Mrs. Purdom, during that part of her cross-examination seeking to obtain from her the reason why she did not want appellant to convey the deceased to his home, and why she told him not to do so, stated: "I hate to tell why, I did because Rudy Kratzwald sat up there and told me how he killed this man at Harrodsburg." The court on its own motion immediately admonished the jury and excluded the statement from their consideration. No exception or objection to the statement was made by defendant's counsel, nor was there any motion made to set aside the swearing of the jury and continue the case, nor is the alleged error pressed in brief of counsel. In such circumstances we have held in numerous cases and without any to the contrary that appellant may not avail himself of the alleged error, if

one, on appeal to this court. Such unanimous determinations by this court are too well understood to require the citation of supporting cases.

We therefore conclude that the evidence, though circumstantial, was sufficient to submit appellant's guilt to the jury and also sufficient to uphold the verdict of guilty returned by the jury. Wherefore the judgment is affirmed.

The whole court sitting.